UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Patricia Marie Boyd,

Petitioner,

vs.

State of Minnesota,

Respondent.

Case File No.: 00-725 JMR/FLN

**REPORT AND RECOMMENDATION**

---

Leslie J. Rosenberg for Patricia Marie Boyd.
Hilary Lindell Caligiuri for the State of Minnesota.

---

**THIS MATTER** came before the undersigned United States Magistrate Judge on Patricia Marie Boyd's ("Petitioner's") Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2254. Petitioner was convicted by a Mower County, Minnesota, jury of murder in the second degree, manslaughter in the second degree, and interference with a dead body, in violation of Minn. Stat. §§ 609.19, 609.205, and 609.502 (1994). The Honorable Michael H. Siebel sentenced Petitioner to the presumptive sentence of 306 months for a severity level X offense committed by a defendant with no criminal history points under the Minnesota Sentencing Guidelines. See Minn. Sentencing Guidelines §§ IV, V (as amended effective August 1, 1994).

Petitioner dismissed a direct appeal and petitioned the trial court for postconviction relief. After an evidentiary hearing, the postconviction court denied relief. The postconviction court's order was affirmed by the Minnesota Court of Appeals. See State v. Boyd, 1999 WL 185250

OCT 25 2000
FILED
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD
DEPUTY CLERK

(Minn. Ct. App. Apr. 6, 1999). The Minnesota Supreme Court denied review.

Boyd's Petition asserts that her federal constitutional rights were violated by the failure of the State to prove an essential element of the crime, by the failure of the jury to determine if an infant was "born alive" as Petitioner alleges is required in Minnesota infanticide cases, and by Petitioner's receipt of ineffective assistance of counsel.

## I. BACKGROUND

Petitioner was convicted of intentionally drowning her newborn baby in a toilet on May 24, 1995. (T. 949, 950). On that date, Petitioner was approximately thirty-six weeks pregnant. (T. 315, 350, 395). Despite being told after the birth of her first child that future pregnancies would be high-risk and could lead to a premature birth, Petitioner never visited a physician during this pregnancy and told very few people about it. (T. 109-10, 112, 243-44, 794-95, 815-16).

Petitioner's water broke during the evening of May 23, 1995, but she stated at trial that she thought that she had wet the bed. (T. 249-50, 797, 305). Although she felt fine during the morning of May 24, 1995, by late morning she was reduced to screaming for help. (T. 797, 828). In a further attempt to get help, Petitioner tried unsuccessfully to get to her apartment door. (T. 831).

At some point after noon, Petitioner went to the bathroom, crouched over the toilet, and gave birth. (T. 800, 831). Petitioner testified at trial that the infant fell from her body and went "whomp" directly into the toilet. (T. 802, 831). Looking into the toilet bowl, Petitioner saw the infant's toes sticking out from a pool of bloody water. (T. 804, 832-33). Its head was underwater. (T. 832). Petitioner testified that the infant made no noise and was dead. (T. 804).

She did not pull it out of the toilet. (T. 119, 847). The placenta was delivered a few minutes later. (T. 308).

After cleaning herself up, Petitioner went to her neighbors' house, where she arrived at approximately 1 p.m. (T. 186). She told her neighbor, Diane Klouse, that she had an emergency and asked if Klouse would pick up Petitioner's husband, Steven Boyd, from his job site. (T. 188). Petitioner did not mention the infant. (T. 188-89). Klouse agreed to pick up Steven Boyd. (T. 190-91).

Petitioner went home and waited for her husband in the living room (T. 803). When Steven Boyd arrived a few minutes later, Petitioner's only statement was that she had "given birth." (T. 251). Steven Boyd went into the bathroom to investigate, and saw the infant's face and feet in the blood-filled toilet. (T. 252). He removed the infant from the toilet and placed it in a plastic garbage bag held open by Petitioner. (T. 253, 803). Because he was in the middle of pouring cement, Steven Boyd set the plastic bag by the back door landing and returned to work, despite Petitioner's entreaties to take her to the hospital. (T. 255-57, 840).

Steven Boyd returned home a few hours later. (T. 257, 451, 804). Leaving the infant's body at their residence, the couple went to K-Mart to buy oil for the car and to telephone the hospital to ask what should be done. (T. 259, 804-05, 843-44). They were instructed to bring the product of the birth to the hospital, which they did. (T. 259, 805, 845).

Petitioner was treated by Nurse Laura Hindraker and Dr. Frank Razidlo at St. Olaf Hospital in Austin. (T. 203, 290). Petitioner's examination revealed no abnormalities. (T. 205, 208, 311). Petitioner told Nurse Hindraker that she had been "four to five months" pregnant and had "miscarried." (T. 206). Nurse Hindraker refused to open the bag containing the product of

the birth because she could tell from its weight that it was not what would normally be considered a "miscarriage." (T. 206).

Dr. Razidlo and Nurse Hindraker opened the bag together in a back hallway of the hospital and were shocked by its contents. (T. 206, 207, 288). The infant appeared to them to be near-term. (T. 289). Dr. Razidlo returned to Petitioner's room to question her about the pregnancy. (T. 289, 290). Petitioner's responses were short and vague regarding its duration. (T. 292). In a later interview with a practicing OB/GYN surgeon at the hospital, Dr. Laurence Nace, Petitioner reiterated essentially the same information. (T. 307-12).

After leaving the hospital, Petitioner went to visit her friend Toni Gray and told her about the day's events. (T. 262). When Gray asked her why she did not pull the baby out of the toilet, Petitioner answered that she "freaked" and could not touch it. (T. 119).

Police went to the Boyd residence at approximately midnight to question Petitioner. (T. 262, 450). Petitioner told the officers that she had been scared when the baby came, and did not know what to do with everything happening so fast. (T. 515). Petitioner cried as she told the story, but otherwise displayed very little emotion. (T. 452). The officers inspected the bathroom and found that it had been cleaned up, although there were still small amounts of blood on the tub, the back of the door, and around the toilet. (T. 457). Petitioner was unsure whether she had touched the infant or not after it landed in the toilet. (T. 535). These concerns prompted the officers to request that an autopsy be performed on the infant's body. (T. 461-62).

An initial autopsy was performed by Dr. Shekhar Parukelar of St. Olaf Hospital's Pathology Department, and a more comprehensive examination was conducted by Dr. Susan Roe, an Assistant Ramsey County Medical Examiner. (T. 321, 361). Both doctors agreed that

the infant had a gestational age of approximately 36 weeks based on a variety of measures, including length and weight. (T. 315-16, 342, 350-51, 374-87).

By discovering that the infant's lungs floated in water, Dr. Parukelar determined that the infant had breathed. (T. 343). This discovery prompted Dr. Parukelar to transport the remains to Dr. Roe for further investigation. (T. 343, 345).

Dr. Roe confirmed that the infant had breathed by repeating the float test and examining the lungs through a microscope and via x-ray. (T. 364-65). Dr. Roe also found air in the infant's gastrointestinal tract, which indicated that the infant had swallowed air. (T. 365-66, 369). Dr. Roe testified that the amount of air in the gastrointestinal tract was inconsistent with Petitioner's claim that the baby dropped immediately from the birth canal into the water of the toilet. (T. 416). Based on the condition of the lungs, gastrointestinal tract, skin, tissues, general appearance, and posture, Dr. Roe concluded that the infant was born alive, and was capable of surviving outside the uterus. (T. 363-64, 366, 400, 402).

Dr. Roe then attempted to determine the cause of the infant's death. The placenta showed no injuries or other abnormalities which might explain the infant's death during delivery. (T. 387-88). Dr. Roe saw no indications of disease, injury, or other problems that would cause the infant's death. (T. 363, 402). Although Dr. Roe testified that it is never possible to make a certain diagnosis of drowning, the lack of competing causes of death in this case suggested that the infant had drowned. (T. 402-03).

Dr. John Plunkett, the Coroner for Dakota, Carver, Scott and Chisago Counties, testified as a pathology expert for the defense. (T. 712). Dr. Plunkett's estimate of the infant's age was significantly below the other estimates, at approximately 28 to 31 weeks gestational age. (T.

746, 747). Dr. Plunkett still believed, however, that the infant was viable. (T. 746, 747). He agreed with Dr. Roe that the infant lived, breathed, and swallowed air, and found no organ abnormalities, congenital defects, or trauma that could explain the infant's death. (T. 747, 749, 760, 766-67). Dr. Plunkett found that the cause of death was most likely drowning. (T. 760). He did note that the infant could have breathed between emerging from the birth canal and hitting the water in the toilet bowl. (T. 772).

After six days of testimony, the case was submitted to the jury with instructions on second-degree murder, the lesser-included offense of second-degree manslaughter, and interference with a dead body. (T. 932-36, 941). Neither party objected to the instructions, which were copied from the Minnesota Jury Instruction Guides, even though the instructions did not require the jury to determine if the infant had been "born alive." (T. 94[illegible]). After one day of deliberation, the jury returned with guilty verdicts on all three counts. (T. 949, 950).

Petitioner dismissed a direct appeal and petitioned the district court for postconviction relief. (P. 1). Represented by new counsel, Petitioner received a hearing and called Dr. Roe and Petitioner's trial counsel, Rich McCluer, as witnesses. (P. 3, 15). Dr. Roe testified that her opinion that the baby was born alive was not based on the common-law definition of that term because it was possible that the placenta was still inside Petitioner when the baby stopped breathing. (P. 5). Dr. Roe still maintained her opinion, however, that the baby had breathed for more than two minutes and perhaps as long as five minutes. (P. 11). Dr. Roe also noted that a baby which is attached to the placenta may still breathe by drawing oxygen from the surrounding air. (P. 14).

McCluer testified as to why he chose not to request that the jury be questioned on whether the infant was "born alive." (P. 16, 17). McCluer stated that he was aware of the distinction between the medical and common-law definitions of "born alive," because he had researched the issue before trial, examined his former partner's case file from State v. Kinsky, a similar Minnesota case raising the same issues, and discussed the evidence and various issues with Dr. Plunkett. (P. 17-19, 22). Given his examination of the file, Dr. Plunkett did not feel that the issue of whether the infant was born alive was an issue in this case. (P. 22, 24, 25). Based on this information, McCluer concluded that the infant was born alive under the common-law definition and that the better trial strategy would be to focus on the issue of intent. (P. 21, 23, 36, 38, 42, 43). McCluer did not reconsider his decision at trial because Dr. Plunkett's testimony was consistent with his earlier opinion. (P. 21, 38).

The post-conviction court denied relief after finding that the evidence was sufficient to support Petitioner's second-degree murder conviction. On appeal, the Minnesota Court of Appeals affirmed the decisions of the trial court. See State v. Boyd, 1999 WL 185250 (Minn. Ct. App. Apr. 6, 1999).

## II. ANALYSIS

### A. Standard of Review

Federal habeas corpus proceedings constitute a collateral attack by the petitioner upon a final state court judgment, and a federal court is authorized to grant relief "only on the ground that [the petitioner] is in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C.A. § 2254(a)(West 1994); Harris v. Rivera, 454 U.S. 339, 343 102 S.Ct. 460, 463 (1981). The Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA")

amended 28 U.S.C. 2254 to deny habeas corpus relief where a claim is adjudicated on the merits in state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d). This provision of the AEDPA "mandates a deferential review of state court decisions." James v. Bowersox, 187 F.3d 866, 869 (8th Cir. 1999), rehearing and rehearing en banc denied (8th Cir., September 21, 1999).

Under the unreasonable application prong of the statute,

> [the] federal habeas court should not grant the petition unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent.

Long v. Humphrey, 184 F.3d 758, 760 (8th Cir. 1999)(quoting Matteo v. Superintendent, SCI Albionu, 171 F.3d 877, 890 (3d Cir. 1999). "Mere disagreement with the [state] court's conclusions is not enough to warrant habeas relief." Id.

Moreover, a state court's determination on the merits of a factual issue is entitled to a presumption of correctness. 28 U.S.C.A. § 2254(e)(1). This presumption applies to factual determinations both by trial courts and by appellate courts. Sumner v. Mata, 449 U.S. 539, 547, 101 S.Ct. 764, 769 (1981). Petitioners must rebut the presumption of correctness with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**B. Failure to Offer Evidence that an Infant Was Born Alive**

Petitioner argues that the evidence at trial was insufficient to demonstrate beyond a reasonable doubt that the infant was "born alive" and had a "separate and independent existence" at the time of its death. This argument must fail because: (1) Petitioner waived this argument by not raising it in the trial court; (2) the record is clear that the infant was "born alive"; and (3) the present state of the law does not require proof that the infant had a "separate and independent existence."

**1. Waiver**

If a Petitioner fails to present a federal constitutional claim to the state court in the manner prescribed by the state court's procedural rules, the state court declines to address the claim, and the procedural default rests upon "adequate and independent state grounds," the Petitioner is generally barred from obtaining federal habeas review of the defaulting claim. See Wainwright v. Sykes, 433 U.S. 72, 72 (1977)(procedural default occurred when Petitioner failed to make timely objection under state contemporaneous objection rule to admission of inculpatory statements).

In hearing the appeal of this issue, the Minnesota Court of Appeals held that Petitioner's insufficient evidence argument had been waived by Boyd's counsel's failure to raise it at trial. Boyd v. State of Minnesota, 1999 WL 185250 (Minn. Ct. App. 1999). This waiver was in violation of Minnesota Rule of Criminal Procedure 9.02 subd .1, which requires that defendants must disclose reports of examinations and tests, notice of defense witnesses, and notice of defenses prior to trial. It is undisputed that Petitioner's trial counsel did not inform the State that it would rely upon the defense that the infant was not a human being for purposes of the

homicide statute at trial, and indeed did not rely on such a defense. Moreover, this failure constitutes "independent and adequate state grounds" for this court to hear this claim. See Coleman v. Thompson, 501 U.S. 722, 729-31 (1991)(independent and adequate state ground existed where petitioner filed notice of appeal of decision of state habeas court three days after deadline for appeal).

Accordingly, this argument should be deemed waived.

**2. Requirements Not Met**

Even if this argument had not been waived, it would fail. Minn. Stat. § 609.19 (1994) provides inter alia that:

> Whoever does either of the following is guilty of murder in the second degree...:
>
> (1) causes the death of a human being with intent to effect the death of that person...

Minn. Stat. § 609.19. The term "human being" is not defined in the Minnesota Statutes, but has twice been construed by the Minnesota Supreme Court. In State v. Kinsky, 348 N.W.2d 319, 325 (Minn. 1984), the Court upheld a jury conviction in an infanticide case by noting in part that "there was additional evidence from which the jury could have found that the infant was born alive." Although the Court noted that other jurisdictions have required that the state prove "that the infant was 'born alive and had an independent and separate existence from its mother,'" the Kinsky court did not require proof of the victim's independent and separate existence to uphold the mother's conviction. Id. at 325. Rather, the Court determined that the infant was a human being based solely on its status as having been "born alive."

Accordingly, and contrary to the assertions of Petitioner, the present state of the law in Minnesota is that in cases involving the murder of an infant, the State need only prove that the infant was "born alive" and need not prove that it had a "separate and independent existence from its mother."[1]

By finding Petitioner guilty of second-degree murder, the jury implicitly found that the infant was "born alive." Abundant evidence of record supported this conclusion. Both Dr. Roe and Dr. Plunkett agreed that the baby breathed, and Dr. Roe believed that the baby had breathed for far longer than it would take to drop from its mother's birth canal to the toilet. Other evidence, such as the absence of indications of a means of death other than drowning, suggest that the infant was born alive. This evidence alone is sufficient to support the presumption of correctness enjoyed by the state court on the issue of whether the baby was "born alive." Accordingly, this conclusion does not constitute an unreasonable application of existing federal law as interpreted by the Supreme Court, or constitute an unreasonable application of the facts.

Therefore, even if this argument had not been waived, it would not succeed on its merits.

**C. Failure to Submit a Jury Instruction Requiring the Jury to Determine if the Infant Was Born Alive**

Boyd also argues that her Petition should be granted because the jury was not asked to determine whether the infant was born alive.

---

[1]State v. Soto, 378 N.W.2d 625, 630 (Minn. 1985), also discussed by the parties, held that for purposes of criminal homicide statutes, an unborn but viable fetus is not a "human being." As the evidence in this case demonstrates beyond a reasonable doubt that the infant was born, Soto has no bearing on this analysis.

"Federal habeas corpus does not lie for errors of state law." Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475, 480 (1991) (holding that neither the introduction of evidence, nor the jury instruction as to its use so infused the trial with unfairness as to deny due process). See also, Islom v. Lockhart, 847 F.2d 484 (8th Cir. 1988); Berrisford v. Wood, 826 F.2d 747, 753 (8th Cir. 1987), cert. denied, 484 U.S. 1016 (1988)(federal habeas relief from a state conviction is available because of improper jury instructions if the error constitutes a fundamental defect that resulted in a complete miscarriage of justice or so infected the entire trial as to deprive the defendant of a fair trial). Only if such error results in "a fundamental defect which inherently results in a complete miscarriage of justice, [o]r an omission inconsistent with the rudimentary demands of fair procedure," will relief be granted. Frey v. Leapley, 931 F.2d 1253, 1255 (8th Cir. 1991) (holding that failure to give a theory-of-defense instruction, without more, was not a violation of due process) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)).

Whether or not it would have been proper to ask the jury to determine if the infant was "born alive," Boyd did not explicitly request such an instruction. She therefore waived her right to receive such an instruction. Even if Boyd had not waived this right, however, this court concludes that the issue is a matter of state substantive criminal law. Given the absence of a Minnesota Supreme Court opinion requiring that a "born alive" instruction be issued in infanticide cases, the trial court's decision not to include such an instruction, made with the knowing consent of Petitioner, was not "a fundamental defect which inherently results in a complete miscarriage of justice, [o]r an omission inconsistent with the rudimentary demands of fair procedure," such that Petitioner was denied due process. See Frey.

The court concludes that if an error occurred here, it did not rise to constitutional dimensions. The court therefore recommends that petitioner's claim on this issue be dismissed.

**C. Denial of Effective Assistance of Counsel**

Petitioner also argues that trial counsel erred by failing to object to the lack of evidence that a fetus was born alive and by failing to submit a "born alive" instruction to the jury.

Claims of ineffective assistance of counsel fall under the Sixth Amendment, and are proven by the satisfaction of two elements: (1) if counsel's performance was objectively unreasonable; and (2) if counsel's error reasonably caused the jury to convict. Strickland v. Washington, 466 U.S. 668 (1984). Ineffective assistance claims are evaluated under the presumption that counsel has rendered effective assistance to a client. Strickland, 466 U.S. at 689. In addition, strategic choices of trial counsel are entitled to great deference. Id. (citing Michel v. Louisiana, 350 U.S. 91, 100-01 (1955)); Krimmel v. Hopkins, 44 F.3d 704, 710 (8th Cir. 1995). The petitioner bears a heavy burden in showing that he received ineffective assistance of counsel. Strickland, 466 U.S. at 687; Riley v. Lockhart, 726 F.2d 421, 422 (8th Cir. 1984).

Petitioner cannot prove that her trial counsel's failure to argue that the infant was not born alive was objectively unreasonable. Counsel's decision was based on extensive research, including examination of his former law partner's case file from State v. Kinsky, and consultation with Defendant's expert, Dr. Plunkett. Dr. Plunkett informed defense counsel that there was no question that the baby had been born alive. Based on this information, defense counsel determined that it would be better trial strategy to focus on issues of intent. Although some small degree of fault may be attributed to defense counsel for his failure to ascertain that he

and Dr. Plunkett were using slightly different definitions of "born alive," counsel's actions were certainly objectively reasonable.

Moreover, it is far from clear that counsel's alleged error caused the jury to convict. While it is possible, given the instant facts, that the jury might have reached a different conclusion had it been instructed on the "born alive" issue, this possibility is not so great that it outweighs the presumption in favor of defense counsel's decision.

Accordingly, the Petition insofar as it argues that Petitioner received ineffective assistance of counsel should be dismissed.

## III. RECOMMENDATION

Based upon the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Patricia Marie Boyd's Petition for a Writ of Habeas Corpus [#1] be **DENIED**.

DATED: October 24, 2000

FRANKLIN L. NOEL
Chief Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties within ten days of service of this Report and Recommendation written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Circuit Court of Appeals.